GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY PENNING, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FARMERS INSURANCE COMPANY, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

THE PARTIES............................................................................................................... 2

JURISDICTION AND VENUE ..................................................................................... 2

FRAUDULENT CONCEALMEANT AND TOLLING................................................. 3

SUBSTANTIVE ALLEGATIONS ............................................................................... 4

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ....................................... 4

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ....................................................................................... 9

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. .............................................. 13

        1.    Adobe Cookies............................................................................... 13

        2.    Qualtrics Cookies........................................................................... 18

    D.    The Third Parties Intercept User Communications While in Transit. ............... 19

    E.    The Signaling and Addressing Information Intercepted by the Third Parties.............................................................................................. 21

    F.    The Private Communications Collected are Valuable. ...................................... 23

PLAINTIFF'S EXPERIENCES ................................................................................... 24

CLASS ALLEGATIONS ............................................................................................. 27

CAUSES OF ACTION................................................................................................. 29

    First Cause of Action: Invasion of Privacy.................................................... 29

    Second Cause of Action: Intrusion Upon Seclusion....................................... 31

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ................................. 33

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................. 36

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............. 38

    Sixth Cause of Action: Unjust Enrichment.................................................... 42

PRAYER FOR RELIEF ............................................................................................... 43

Plaintiff Stacy Penning ("Plaintiff") brings this action on behalf of himself, the general public, and all others similarly situated against Farmers Insurance Company, Inc. ("Defendant" or "Farmers"). Plaintiff's allegations against Defendant are based on information and belief and the investigation of Plaintiff's counsel, except for allegations specifically pertaining to Plaintiff, which are based on his personal knowledge.

**INTRODUCTION**

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.farmers.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject" cookies, as shown in the following screenshot (which has been slightly cropped to remove white space):



2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "Reject" cookies, Defendant nonetheless caused multiple third parties—including Adobe Inc. (omtrdc.net) and Qualtrics, LLC (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4. Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along

CLASS ACTION COMPLAINT

with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked the "Reject" button on the Website's cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiff and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Stacy Penning is, and was at all relevant times, an individual and resident of El Cerrito, California. Plaintiff intends to remain in California and makes his permanent home there.

8. Defendant Farmers Insurance Company, Inc. is a Kansas corporation with its principal place of business in Woodland Hills, California. Defendant owns, operates, manages, controls, and/or is responsible for the Website, either directly or through affiliated entities.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendant are citizens of different states.

CLASS ACTION COMPLAINT

10.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.     Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

### FRAUDULENT CONCEALMEANT AND TOLLING

14.     The delayed discovery rule applies to Plaintiff's claims. Plaintiff was unaware that, despite clicking the button in the popup cookie consent banner to "Reject" cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to his browsers, stored on his devices, and transmitted to the Third Parties along with his private user data. Plaintiff could not reasonably have discovered this conduct at the time of his visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiff's experiences on the Website would have alerted a reasonable user that his selections were not being honored. Plaintiff lacked the technical expertise and specialized tools necessary to determine whether the Website honored his rejection of cookies or instead continued transmitting his data notwithstanding his selection, and he did not discover Defendant's conduct until a later investigation revealed it.

15.     Despite exercising reasonable diligence, Plaintiff was unaware of Defendant's conduct because Defendant affirmatively represented that users could reject all cookies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiff from discovering his claims

- 3 -

earlier. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.      Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

16.      Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

17.      An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

18.      As a result, Defendant knew or should have known that the devices used by Plaintiff and Class members to access the Website were located in California.

19.      Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party

- 4 -

resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

20. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

21. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

22. A third-party cookie is set by a third-party domain/webserver (e.g., farmersinsurance.tt.omtrdc.net, qualtrics.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

23. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- 5 -
CLASS ACTION COMPLAINT

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

CLASS ACTION COMPLAINT

24.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

25.     Defendant provides insurance products and related financial services to consumers, including automobile, homeowners, renters, life, and other insurance products. Defendant also owns and operates the Website, which allows visitors to, among other things, obtain information regarding insurance products and services, request and review insurance quotes, locate agents, manage insurance accounts, submit claims-related information, and purchase insurance coverage. As users interact with the Website—including by entering information into forms, requesting quotes, searching for insurance products or agents, selecting coverage options, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

26.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control

- 7 -
CLASS ACTION COMPLAINT

over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

27.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Statement:

**Interest-based ads**

Interest-based ads are on-line ads tailored to your likely interests based on your use of various apps and websites across the Internet. If you are using a browser, then cookies and web beacons can be used to collect information to help determine your likely interests. If you are using a mobile device, tablet, or streaming media device that includes an advertising identifier, then that identifier can be used to help determine your likely interests. For your choices about interest-based ads from us, please see the "Cookies" section(below).

…

**Cookies**

A cookie is a message sent to your browser from a web server that is stored on your computer's hard drive. The message is sent back to the web server whenever the browser requests a page from that server. Many commercial Internet sites use cookies. While a code in the cookie file enables the site to label you as a particular user, it does not identify you by name or address, unless you have provided the site with such information or set up preferences in your browser to do so automatically. You may opt out of accepting cookies by changing the settings on your browser. However, rejecting cookies may prevent you from using certain functions and you may have to repeatedly enter information to take advantage of services or promotions. In general, cookies allow us to identify you as a particular user and, thus, provide you with a more customized service. We may also use cookies to track or user requests, inquiries, and traffic patterns or to determine audience size and repeated usage. We use web beacons (also known as pixel tags, or transparent GIF files), to help manage on-line advertising. These files enable us to recognize a unique cookie on your web browser, which in turn enables us to learn which advertisements bring users to our website. With both cookies and other technologies to measure and optimize on-line advertising, the information that we collect, and share is anonymous and not personally identifiable. It does not contain your name, address, telephone, nor e-mail address.

When you visit our website, other parties may collect personally identifiable information about your on-line activities over time and across different websites. Notwithstanding any other provision, we may work with third parties who may collect information from you, such as your IP address and information about your browser or operating system and may place or recognize a unique cookie on your browser for the purpose of enabling interest-based content or advertising to you. The cookies placed by our third-party service providers contain no personally identifiable information: they may contain demographic or other Internet-based data in a de-identified form. The information in these cookies may be linked to

- 8 -
CLASS ACTION COMPLAINT

data you voluntarily have submitted to us, such as your name, postal address, or e-mail, which we may share in hashed or encrypted form…[1]

**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies.**

28.    When Plaintiff and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "This website uses cookies and other tracking technologies to enhance user experience. Farmers is committed to your privacy and security…You may accept or reject targeting cookies that sell and/or share your personal information." The banner then purported to provide users the opportunity, rather than choosing to "Accept" all such cookies and tracking technologies, to instead "Reject" cookies and tracking technologies, including targeting cookies that sell and/or share users' personal information, as shown in the following screenshot from the Website (which has been slightly cropped to remove white space):



29.    Plaintiff and other Website users who clicked the "Reject" button, thereby indicating their choice and/or agreement to decline or reject cookies and tracking technologies in use on the Website, including those targeting cookies that sell and/or share users' personal information, could then continue to browse the Website, as the popup cookie consent banner disappeared.

30.    Defendant's popup cookie consent banner led Plaintiff, and all those Website users similarly situated, to believe that they declined or rejected cookies and tracking technologies, especially those "targeting cookies" used to "sell and/or share [users'] personal information." The banner further reasonably led Plaintiff and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their

---

[1] Farmers "Enterprise Privacy Statement" (Effective 4/2025) (formerly available at https://www.farmers.com/privacy-statement/) (the "Privacy Statement"). Defendant has subsequently updated its Privacy Statement but, based on information and belief, this version was in effect at the time of Plaintiff's rejection of cookies on the Website.

Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking the "Reject" cookies button.

31.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff's or other users' wishes. When Plaintiff and other Website users clicked the "Reject" cookies button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

32.    Nevertheless, even after receiving that notice, Defendant caused the Third Parties' tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

33.    In particular, when users clicked the "Reject" cookies button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

34.    Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third Parties even after the user clicked the "Reject" cookies button on the Website's popup cookie consent banner.

CLASS ACTION COMPLAINT



35.    The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.farmers.com. The screenshot depicts only network traffic occurring *after* the user rejected all such cookies using the cookie banner. As shown above, despite the user's rejection

CLASS ACTION COMPLAINT

of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like farmersinsurance.tt.omtrdc.net, qualtrics.net, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshot demonstrates that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies by clicking the "Reject" cookies button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

36.    Plaintiff's and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

37.    As users interact with the Website, even after clicking the "Reject" cookies button, thereby declining or rejecting the use of cookies and similar technologies for targeted advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits

- 12 -

and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

38.    The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties— separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[2]

### 1.    Adobe Cookies.

39.    Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users chose to "Reject" cookies (including "targeting cookies that sell and/or share your personal information"), to and from the **farmersinsurance.tt.omtrdc.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

40.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[3] These cookies enable Adobe to obtain and store at least the

---

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked the "Reject" button in the popup cookie consent banner to reject all cookies.

[3] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies

following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[4]

41.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[5]

42.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Adobe's domain at omtrdc.net, even after users have rejected all cookies on the Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

(available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[4] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[5] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

```
19 ∨      "window": {
20          "width": 854,
21          "height": 766
22        },
23 ∨      "browser": {
24          "host": "esales.farmers.com",
25          "webGLRenderer": "ANGLE (Apple, ANGLE Metal
            Renderer: Apple M1, Unspecified Version)"
26        },
27 ∨      "address": {
28          "url": "https://esales.farmers.com/quote/auto/
            personal-info?LOB=A&ZIP=90210&cid=00001&
            promoid=00001&SRC=FC000000001&Source_Indicator=FC&
            showView=default",
29          "referringUrl": "https://esales.farmers.com/
            fastquote/"
30        },
31        "beacon": true
32      },
33 ∨    "id": {
34        "tntId": "5489bca851b04c98b39080456d9c9d46.34_0"
35      },

36 ∨    "property": {
37        "token": "b5765d4d-20cb-17c4-ee5f-c9d1f2bdcac8"
38      },
39 ∨    "experienceCloud": {
40 ∨      "analytics": {
41          "logging": "server_side"
42        }
43      },
44 ∨    "notifications": [
45 ∨      {
46          "id": "17b5f4fb84734f708ac247bf079bbe23",
47          "type": "display",
48          "timestamp": 1753906149346,
49 ∨        "view": {
50            "name": "personal-info"
51          }
52        }
53      ],
54      "impressionId": "b090e8fa0faf494d9436d45765b001a5"
55    }
```

```
POST    204    https://farmersinsurance.tt.omtrdc.net/
               080456d9c9d46&version=2.10.2
```

Request  Header  Query  Body  Cookies  Raw | Summary  +          ≡

| Key | Value |
|---|---|
| hyundaimotorcompany! mboxPC | 3d2745d1bc14446a8a2761a717f99fcb.34_0 |

CLASS ACTION COMPLAINT

43. The data indicates, among other things, the URL that the user was visiting. In this case, the URL reveals to Adobe that the user was seeking a quote for personal auto insurance, for zip code 90210.

44. The "sessionId" key is designed to persist during the entirety of the user's visit, enabling Adobe to link the user's pageviews across the Website.

45. The data also reveals to Adobe, among other things, the user's device, operating system, and screen size in pixels.

46. In addition, the Website causes the user's browser to send a tracking cookie to Adobe. In this instance, the name of the tracking cookie illustrates the danger associated with Defendant's failure to properly configure its website to honor cookie opt-outs. The cookie's name "hyundaimotorcompany!mboxPC" reveals to Adobe that this is the same user that previously visited the Hyundai website—showing Adobe the brand of car that the user is seeking to insure.

47. Along with this data, the "referer" and "user-agent" headers are sent to Adobe. The "referer" header confirms that the user was viewing the Website, and the "user-agent" header further confirms the user's device information.

48. Finally, the data sent to Adobe includes the user's IP address, which can be used to determine a user's geolocation, including whether they are located in California.

**2.    Qualtrics Cookies.**

49. Defendant also causes third-party cookies and tracking technologies to be transmitted to and from Website users' browsers and devices, even after users chose to "Reject" cookies (including "targeting cookies that sell and/or share your personal information"), to and from the siteintercept.qualtrics.com domain. This domain is owned by Qualtrics, LLC, a software company that provides software and analytics tools that enable website operators to collect, analyze, and evaluate information regarding users' interactions with websites and other digital platforms as well as market research and analysis.[6]

---

[6] https://www.qualtrics.com/.

CLASS ACTION COMPLAINT

50.    Through its tracking technologies and associated identifiers, Qualtrics is able to recognize returning users, associate information collected during multiple website visits, measure user activity and engagement, and generate analytics regarding users' interactions with digital content.[7] These technologies utilize unique identifiers assigned to users' browsers and devices in order to distinguish users and track activity across sessions.[8] Qualtrics, LLC uses these features to promote its software.[9]

51.    One of the tracking cookies that Defendant causes to be transmitted to Qualtrics is the "QuantumMetricUserID" cookie shown in the screenshot below:

52.    The "QuantumMetricUserID" cookie assigns a unique identifier to a user's browser or device and enables Qualtrics to associate that identifier with information regarding the user's interactions with the Website. Through this identifier and related tracking technologies, Qualtrics obtains and stores user information including, without limitation: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Third Parties Intercept User Communications While in Transit.**

53.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon

---

[7] https://www.qualtrics.com/cookie-statement/#:~:text=These%20cookies%20allow%20us%20to,able%20to%20monitor%20its%20performance.
[8] *Id.*
[9] https://www.qualtrics.com/customer-experience/.

CLASS ACTION COMPLAINT

incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

54.     First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

55.     Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[10] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[11] This deduplication occurs as the communications are received, before they are stored.

56.     Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

57.     Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate

---

[10] On information and belief, each of the Third Parties uses a server-to-server API to collect user data.
[11] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

CLASS ACTION COMPLAINT

it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

58.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

59.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

E.    **The Signaling and Addressing Information Intercepted by the Third Parties.**

60.    The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class

CLASS ACTION COMPLAINT

Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

61. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

62. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

63. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination

- 22 -

CLASS ACTION COMPLAINT

port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.     The Private Communications Collected are Valuable.**

64.     As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

65.     The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular insurance products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

66.     Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader insurance market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

67.     The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal

CLASS ACTION COMPLAINT

information is an important currency in the new millennium."[12] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

68.     Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

69.     By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFF'S EXPERIENCES

70.     Plaintiff visited the Website to seek information about Farmers insurance products, while located in California, on one or more occasions during the last four years, including in or around May or June 2025. In particular, Plaintiff visited the Website to obtain information regarding automobile insurance and to explore obtaining an insurance quote. Plaintiff navigated to the Website's quote tool, entered information including his zip code, and completed portions of the quote questionnaire in order to receive pricing and coverage information. Plaintiff ultimately did not submit the quote request after learning that Defendant would contact him by telephone rather than providing the quote directly through the Website.

71.     Plaintiff's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

---

[12] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

72.     When Plaintiff visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject" cookies button. Plaintiff viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies and other tracking technologies to enhance user experience. Farmers is committed to your privacy and security…You may accept or reject targeting cookies that sell and/or share your personal information." Plaintiff also viewed Defendant's additional representation that users could, rather than choosing to "Accept" cookies and tracking technologies, instead "Reject" cookies and tracking technologies, including those "targeting cookies that sell and/or share [Plaintiff's] personal information[,]" by clicking the button to do so.

73.     Plaintiff selected and clicked the "Reject" cookies button. Plaintiff believed that selecting the "Reject" cookies button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject cookies and other tracking technologies (inclusive of those "targeting cookies that sell and/or share [users' and Plaintiff's] personal information").

74.     In selecting the "Reject" cookies button, Plaintiff gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically rejected, based on Defendant's representations, those "targeting cookies" used to "sell and/or share [Plaintiff's] personal information" to or with third parties. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

75.     Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for targeted advertising and the selling or sharing of users' personal information, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff that he could reject the use and/or placement of cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff believe, he did not have a choice

- 25 -

CLASS ACTION COMPLAINT

about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

76.     Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising and selling or sharing users' personal information to or with the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

77.     Defendant's representations that consumers could "Reject" cookies while Plaintiff and users browsed the Website, or at least those "targeting cookies that sell and/or share [users' and Plaintiff's] personal information[,]" were untrue. Had Plaintiff known this fact, he would not have used the Website. Moreover, Plaintiff reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject cookies and tracking technologies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

78.     Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject cookies and tracking technologies. If the Website were programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a

CLASS ACTION COMPLAINT

specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

79. Plaintiff brings this Class Action Complaint on behalf of himself and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the United States after clicking the "Reject" button in the popup cookies consent banner.

80. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

81. **Numerosity:** Plaintiff does not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

82. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

- 27 -
CLASS ACTION COMPLAINT

83. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

84. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff, like the other Class members, visited the Website, rejected cookies and tracking technologies, and had his confidential Private Communications intercepted by the Third Parties.

85. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

86. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions

CLASS ACTION COMPLAINT

would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

87.    Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

88.    To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

89.    Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiff's and Class members' Fourth Amendment right to privacy.

90.    Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject" cookies and tracking technologies before proceeding to browse the Website. Plaintiff and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiff and Class members rejected cookies and tracking technologies, including those targeting cookies that sell and/or share users' personal information, and reasonably expected that their rejection of all such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on

- 29 -

their devices while they browsed the Website. Plaintiff and Class members also reasonably expected that, if they rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

91.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

92.    Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

CLASS ACTION COMPLAINT

93.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

94.    Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

95.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

96.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

97.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

98.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

99.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

100.    To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a

CLASS ACTION COMPLAINT

reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

101.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

102.    The Third Parties' tracking and collecting of Plaintiff's and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiff and Class members, and, in fact, those Website users specifically chose to "Reject" all such cookies.

103.    Plaintiff and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject" cookies and tracking technologies, including "targeting cookies that sell and/or share [Plaintiff's and Class members'] personal information[,]" as well as state criminal and civil laws designed to protect individual privacy.

104.    Defendant's intentional intrusion into Plaintiff's and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiff and Class members reasonably expected, based on Defendant's false representations, that when they rejected cookies and tracking technologies, including "targeting cookies that sell and/or share

- 32 -
CLASS ACTION COMPLAINT

[Plaintiff's and Class members'] personal information[,]" Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

105.    Defendant's conduct was intentional and intruded on Plaintiff's and users' Private Communications on the Website.

106.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

107.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

108.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Website's use of cookies and tracking technologies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

109.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

110.    California Penal Code § 631(a) provides, in pertinent part:

"Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in

- 33 -

CLASS ACTION COMPLAINT

any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

111.   Defendant is a "person" within the meaning of California Penal Code § 631.

112.   The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

113.   Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other.

114.   Under § 631(a), Defendant must show it had the consent of all parties to a communication.

115.   At all relevant times, the Website caused Plaintiff and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiff's and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiff and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

116.   At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

- 34 -

electronic communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

117.    The Private Communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

118.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

119.    Plaintiff and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiff and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic communications by choosing to reject cookies and tracking technologies, including "targeting cookies that sell and/or share [Plaintiff's and Class members'] personal information[,]" in the consent banner.

120.    The wiretapping of Plaintiff and Class members occurred in California, where Plaintiff and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiff's and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties,

CLASS ACTION COMPLAINT

resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

121.    Plaintiff and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

122.    Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

123.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the internet to search for information and content related to insurance products. Plaintiff, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know if their request to reject cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of**

**Privacy Act (California Penal Code § 638.51)**

124.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

125.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

126.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

127.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

128.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's and the Class's computers or devices. Cal. Penal Code § 638.50(b).

129.    At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties.

CLASS ACTION COMPLAINT

130.   Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's and the Class members' electronic communications with the Website.

131.   Plaintiff and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject" cookies button in the cookie consent banner.

132.   Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's and Class member's IP addresses and user-agent information.

133.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

134.   Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

135.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

136.   Defendant fraudulently and deceptively informed Plaintiff and Class members that they could "Reject" cookies and tracking technologies, including those "targeting cookies that sell and/or share [Plaintiff's and Class members'] personal information."

137.   However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Reject" cookies button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' Private Communications, even when consumers had previously chosen to "Reject" cookies.

138.   Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

- 38 -
CLASS ACTION COMPLAINT

139. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

140. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject all cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

141. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

142. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored,

CLASS ACTION COMPLAINT

and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

143. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See, e.g.*, California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

144. On information and belief, Defendant either knew its representations regarding users' ability to reject cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

145. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and Class members as to whether to use the Website. In misleading Plaintiff and Class members and not so informing them, Defendant breached its duty to Plaintiff and Class members. Defendant also gained financially from, and as a result of, its breach.

146. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

147. Plaintiff and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the

- 40 -

CLASS ACTION COMPLAINT

use and sale of consumers' browsing activity, as alleged above. Plaintiff and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

148. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

149. Defendant's representation that consumers could reject cookies and tracking technologies (including "targeting cookies that sell and/or share [Plaintiff and Class members'] personal information") if they clicked the "Reject" cookies button was untrue. Again, had Plaintiff and Class members known these facts, they would not have used the Website. Moreover, Plaintiff and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to targeted advertising and/or share information with third parties even after they choose to reject all such cookies, Plaintiff and Class members would have noticed it and would not have interacted with the Website.

150. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all such cookies. As a result, Plaintiff and the Class provided more personal data than they would have otherwise.

151. Plaintiff and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

152. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

CLASS ACTION COMPLAINT

153. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Website's use of cookies and tracking technologies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

<u>Sixth Cause of Action</u>: Unjust Enrichment

154. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

155. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

156. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject" cookies and tracking technologies, including "targeting cookies that sell and/or share [Plaintiff and Class members'] personal information[,]" and by permitting the Third Parties to store and transmit cookies on Plaintiff's and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

157. Plaintiff and Class members' Private Communications have conferred an economic benefit on Defendant.

158. Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

159. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff and Class members.

160. It would be unjust for Defendant to retain the value of Plaintiff's and Class members' property and any profits earned thereon.

161. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

162. Plaintiff and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

163. Plaintiff pleads this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiff would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiff, on behalf of himself and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiff and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

CLASS ACTION COMPLAINT

Dated: June 19, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT